

TEL 316-263-5851  FAX 316-263-4677
300 W. Douglas Ave., Ste. 500 • Wichita, Kansas 67202
www.McDonaldTinker.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| LAKENDRA BRYANT, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. |
| WESTLAKE MANAGEMENT SERVICES, INC. d/b/a NAPCO PIPE AND FITTING, | ) ) ) |
| Defendant. | ) ) |

Pursuant to K.S.A. Chapter 60

## **COMPLAINT**

COMES NOW Plaintiff, Lakendra Bryant ("Ms. Bryant"), by and through her attorneys, Jennifer M. Hill and Corey M. Adams of McDonald Tinker PA, and for her cause of action against the Defendant, Westlake Management Services, Inc. d/b/a NAPCO Pipe and Fitting ("Defendant" or "NAPCO"), alleges and states as follows:

1. Lakendra Bryant is a resident of McPherson County, Kansas.

2. Defendant is a Kansas limited liability company registered to do business in Kansas and may be served with legal process through its resident agent The Corporation Company, Inc., at 112 SW 7th Street Suite 3C, Topeka, KS 66603.

3. The Court has jurisdiction over this matter.

4. Venue is proper in this Court.

5. Ms. Bryant filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on or about June 18, 2020.

6. The EEOC issued a Right to Sue letter on December 17, 2020.

## **GENERAL ALLEGATIONS**

7. Ms. Bryant started work at Westlake nearly three years ago, in September 2017, as a machine operator at the C-Level.

8. Ms. Bryant was promoted to a B-level prior to her termination.

9. Ms. Bryant's original supervisor was Grant Andrews.

10. In 2019, Ms. Bryant began being supervised by Lyle Martin.

11. Ms. Bryant was severely and pervasively harassed by her coworkers, specifically Doug Barnhardt and Bart Roberts.

12. Mr. Barnhardt routinely harassed Ms. Bryant with racist comments regarding the details of her personal life.

13. On one occasion, Mr. Barnhardt commented on Ms. Bryant's tenure at NAPCO. Ms. Bryant was the only black female there. Mr. Barnhardt made sure to point this out by noting that she has lasted longer than any other person of color. This, along with other racist jokes, was aimed at making Ms. Bryant feel unwelcome and uncomfortable at NAPCO.

14. On another occasion, Mr. Barnhardt questioned her about being in an interracial relationship and having "mixed" children. He also asked her about getting married in Canton, Kansas. Canton is a city with few people and even fewer persons of color. These were clearly designed to taunt and racially harass her.

15. In late January 2020, Mr. Barnhardt started a rumor about Ms. Bryant amongst coworkers while she was not at work. When Ms. Bryant returned to work, she found that her coworkers were discussing her having marital problems with her husband. She also learned that Mr. Barnhardt was initiating invasive conversations by asking coworkers about her children and husband.

16. Ms. Bryant made reports of the above-described conduct, and other conduct of Mr. Barnhardt and Mr. Roberts, to her supervisors, but nothing was ever done about it.

17. In fact, Ms. Bryant was actually punished for making these complaints against her co-workers.

18. In addition to the conduct perpetuated by Mr. Barnhardt and Mr. Roberts, Ms. Bryant was also unfairly treated by her supervisor, Mr. Martin.

19. For example, Ms. Bryant was often unfairly evaluated in her employee performance reviews. Ms. Bryant noticed that she was singled out for talking to coworkers and leaving her work area. This was common practice on the floor, yet no other employees received these types of derogatory evaluations.

20. Shortly after Mr. Barnhardt was reprimanded for the rumors mentioned above, the harassment became more extreme.

21. On February 25, 2020 Ms. Bryant noticed that her truck was shot at with a BB gun.

22. Upon leaving work that day, she was able to see several holes in the tailgate of her truck that were not there when she arrived for work.

23. It was apparent to her that someone at NAPCO vandalized her truck. Indeed, on the day prior, Ms. Bryant washed her truck and kept it overnight in a garage, and there were no bullet holes in her truck. Furthermore, her truck did not leave the parking lot that day until the end of her shift.

24. Upon returning home that night, she called the police. The police came to her home, saw the damage, and made a report.

25. Again, on March 1, 2020, Ms. Bryant noticed new damage to the back of her truck. This time there was a BB hole in the taillight of her truck with the BB bullet still in the casing of the taillight.

26. When she returned home this time, however, she saw thousands of roofing nails dumped in her driveway in anticipation of her arrival.

27. Ms. Bryant again called the police. When the police arrived, they did not only notice the new damage to her truck and the nails in her driveway, they also found two bricks in her yard with several writings on them. One of them stated: "move out Oprah your [sic] not welcome in this neighborhood."

28. Ms. Bryant obviously upset also reported this to Mr. Martin. She had a 1-hour phone call with him retelling everything that had taken place and the harassment at her home.

29. She also indicated that Mr. Barnhardt and Mr. Roberts most likely did this. Ms. Bryant believed this to be true as the two were very close friends at work. She had also heard them talking about owning BB guns.

30. Ms. Bryant took a few days off work following this incident. Mr. Martin claimed that the incidents regarding her truck being shot at would be investigated by the time she returned to work.

31. Mr. Martin claimed that he reviewed security camera footage from the parking lot, but that could not make out who caused the damage.

32. Mr. Martin stated that the footage was blurry, and the cameras did not reach the street, where the shooter was positioned when her car was shot in the NAPCO parking lot. Again, nothing was done.

33. On March 23, 2020, someone called in a false terrorist threat to NAPCO officials alleging Ms. Bryant was going to "shoot up" the place.

34. When Ms. Bryant arrived at work, she noticed police officers in the office. The police promptly searched her locker and purse for a gun. Ms. Bryant does not own a gun.

35. Ms. Bryant was escorted out of the building by the Plant Manager Matt Talley. When they reached Ms. Bryant's truck, Mr. Talley took notice of the damage to her vehicle and indicated that Mr. Barnhardt was the one who called in the terrorist threat.

36. Despite knowing that Ms. Bryant had recently reported Mr. Barnhardt for racial harassment, Defendant still took Mr. Barnhardt at his word when he called in the obviously bogus threat. Again, Ms. Bryant does not own a gun.

37. Ms. Bryant was suspended three days with pay. Upon leaving work, Mr. Martin said to her "see you back on Friday".

38. When Friday came, Ms. Bryant texted Mr. Martin to get an update on the investigation and to see if it was possible to come back to work. Mr. Martin indicated that he was left in the dark and that the investigation was not complete.

39. Ms. Bryant was contacted on Monday, March 30, 2020 and told that she was terminated.

40. Nobody heard Ms. Bryant actually make the "terrorist" threat to Mr. Bernhardt. The only direct account of the alleged "terrorist" threat was Mr. Bernhardt.

41. Defendant simply accepted the account of Mr. Bernhardt, a person for whom Ms. Bryant alleged engaged in racial discrimination and whom Defendant knew had personal disagreements with Ms. Bryant.

42. Additionally, Defendant also categorically accepted Mr. Bernhardt's statement that Mr. Roberts engaged in the vandalism, when they did not believe Ms. Bryant's report of the same.

## **COUNT 1: TITLE VII HOSTILE WORK ENVIRONMENT**

43. Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

44. Ms. Bryant is African American.

45. Ms. Bryant sustained continued, pervasive and severe harassment by Mr. Barnhardt and Mr. Roberts in the following nonexclusive ways:

   a. By being continuously harassed for her race, when such harassment did not occur against similarly situated white employees;

   b. By being constantly harassed about her sexual history, when such harassment did not occur against similarly situated white employees;

   c. By being emotionally abused, which did not happen with similarly situated white employees; and

   d. By being threatened with nails in her driveway and by having bricks with blatantly racist comments made on it left at her personal residence.

46. This harassment continued for over a year, despite repeated reports from Ms. Bryant.

47. Ms. Bryant reported this harassment to her supervisors, including Mr. Martin, on multiple occasions.

48. Despite the reports, the harassment continued.

49. The harassment altered the terms, conditions and privileges of employment for Ms. Bryant.

50. The harassment clearly stemmed from racial animus as the jokes and degrading terms used were based on Ms. Bryant's status as an African American female and often related to her physical characteristics.

51. The Defendant created a hostile work environment by allowing hostile and racist co-workers to degrade and humiliate Ms. Bryant without discipline.

52. As a direct and proximate result of this violation of the law, Ms. Bryant suffered damages due to the Defendant's failure to create a workplace free of discrimination, where race is not a barrier to opportunity.

## COUNT 2: TITLE VII RACIAL DISCRIMINATION

53. Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

54. Ms. Bryant is an African American.

55. Ms. Bryant satisfactorily performed her duties for Defendant since September 2017.

56. Ms. Bryant was treated differently than her Caucasian counterparts, including that policies were applied to her in a discriminatory manner.

57. Defendant terminated Ms. Bryant because of being falsely accused of making a terrorist threat, when the person that made the accusation was known by Defendant as having engaged in racial discrimination and harassment of Ms. Bryant. Despite this knowledge by Defendant, Defendant terminated Ms. Bryant and retained Mr. Barnhardt, the white male who severely and pervasively racially harassed Ms. Bryant.

58. Ms. Bryant was inappropriately disciplined and monitored by the Defendant because they failed to provide a safe working environment for her.

59. As a direct and proximate result of this violation of the law, Ms. Bryant suffered damages due to the Defendant's discrimination against her.

## COUNT 3: TITLE VII RETALIATION

60. Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

61. Ms. Bryant is an African American.

62. Ms. Bryant satisfactorily performed her duties for Defendant since September 2017.

63. Ms. Bryant complained of racial discrimination and harassment for a large portion of her employment, including the harassment she received from Mr. Barnhardt and Mr. Roberts.

64. Not only did Defendant not investigate the complaints or discipline the perpetrators of the racial discrimination and harassment, but Defendant also actually punished Ms. Bryant for making the complaints.

65. The retaliation reached a peak when Defendant terminated Ms. Bryant because of being falsely accused of making a terrorist threat, when the person that made the accusation was known by Defendant as having engaged in racial discrimination and harassment of Ms. Bryant. Despite this knowledge by Defendant, Defendant terminated Ms. Bryant and retained Mr. Barnhardt, the white male who severely and pervasively racially harassed Ms. Bryant.

66. Ms. Bryant was inappropriately disciplined and monitored by the Defendant because it failed to provide a safe working environment for her.

67. As a direct and proximate result of this violation of the law, Ms. Bryant suffered damages due to the Defendant's discrimination against her.

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant; that the Court award Plaintiff all damages to which she is entitled, including, but not limited to, lost wages, statutory penalties, compensatory damages, and damages for emotional distress and mental anguish; that the Court award her reasonable attorney fees and the costs of this action; and that the Court allow such other and further relief as the Court deems just and equitable.

Respectfully submitted,

 s/ Jennifer M. Hill
Jennifer M. Hill, #21213
Corey M. Adams, #27253
McDonald Tinker PA
300 W. Douglas, Ste. 500
Wichita, KS 67202-2909
T: (316) 263-5851 F: (316) 263-4677
E:      jhill@mcdonaldtinker.com
         cadams@mcdonaldtinker.com
*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Ms. Bryant hereby requests, pursuant to K.S.A. 60-238, a trial by a jury of 12 in the above-captioned matter.

s/ Jennifer M. Hill
Jennifer M. Hill, #21213